**Elena DEL CAMPO, et al., Plaintiffs,**

v.

**AM. CORRECTIVE COUNSELING SERV., INC., et al., Defendants.**

No. C 01–21151 JW.

United States District Court, N.D. California, Northern Division, San Jose Division.

June 3, 2010.

Deepak Gupta, Public Citizen Litigation Group, Washington, DC, Lester A. Perry, Salt Lake City, UT, Paul Arons, Sharon Kathleen Grace, Law Office of Paul Arons, Friday Harbor, WA, Ronald Wilcox, Attorney at Law, San Jose, CA, O. Randolph Bragg, Horwitz, Horwitz & Associates, Chicago, IL, for Plaintiffs.

David L. Hartsell, McGuirewoods LLP, Chicago, IL, Hugh Tabor Verano, Jr., Verano & Verano, San Juan Capistrano, CA, Peter Manfred Bransten, Landau & Berger LLP, San Francisco, CA, Eric Neil Landau, Jones Day, Irvine, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

JAMES WARE, District Judge.

### I. INTRODUCTION

Plaintiffs[1] bring this class action alleging, *inter alia*, that Defendants[2] engaged in a pattern of behavior in implementing the Santa Clara County Bad Check Restitution Program ("Bad Checks Program") that violates the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.

---

1. Plaintiffs are Elena del Campo ("del Campo"), Miriam Campos, Ashorina Medina, Lois Artz, and Lisa Johnston (collectively, "Plaintiffs").

2. Defendants are American Corrective Counseling Services, Inc. ("ACCS"), Don Mealing ("Mealing"), Lynn R. Hasney ("Hasney"), Inc. Fundamentals ("Inc."), Fundamental Performance Strategies ("FPS"), Fulfillment Unlimited, Inc., ACCS Administration, Inc., Mr. Green, R.D. Davis, Mr. Kramer, and Mrs. Lopez.

§ 1692, the California Constitution article I, sections 1 and 7, and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code §§ 17200 *et seq.*

Presently before the Court are the parties' Cross–Motions for Summary Judgment.[3] The Court conducted a hearing on March 22, 2010.[4] Based on the papers submitted to date and oral argument, the Court GRANTS in part and DENIES in part the parties' Cross–Motions.

## II. BACKGROUND

Since the facts of this case are largely undisputed, the Court provides them as necessary in the discussion below. The Court reviews the case's procedural history to provide some context for these Motions.

This case is a consolidated case between *del Campo v. Kennedy,* Case No. 01–21151 JW and *Medina v. Mealing,* Case No. 03–2611 JW. In the original suit, Plaintiff del Campo filed a class action against the De-fendants for violations of her Due Process rights pursuant to Section 1983 and the California Constitution article I, section 7. Plaintiff del Campo also alleged violations of the FDCPA and the California UCL. Upon Defendants' motion, the Court dismissed del Campo's Section 1983 and California Constitution causes of action with prejudice based on her failure to state a claim. In *Medina v. Mealing,* Plaintiff Medina also filed a class action against the Defendants for violations of Section 1983 and the California Constitution. On February 1, 2006, the Court consolidated Plaintiffs' cases into the present action. (Order Granting Motion to Consolidate Case, Docket Item No. 161.)

On December 5, 2006, 491 F.Supp.2d 891 (N.D.Cal.2006), the Court dismissed with prejudice all of Plaintiffs' federal claims for violations of their due process rights pursuant to Section 1983 and the California Constitution, and dismissing District Attorney George Kennedy from the case.[5]

3. (Plaintiffs' Motion for Summary Judgment and Declaratory and Injunctive Relief Against Defendants Don Mealing, Lynn Hasney and Inc. Fundamentals, hereafter, "Plaintiffs' Motion," Docket Item No. 807; Defendant Donald R. Mealing's Motion for Summary Judgment, hereafter, "Defendant Mealing's Motion," Docket Item No. 802; Defendant Lynn R. Hasney's Motion for Summary Judgment, hereafter, "Defendant Hasney's Motion," Docket Item No. 798; Defendant Inc. Fundamentals' Motion for Summary Judgment, hereafter, "Defendant Inc.'s Motion," Docket Item No. 794.)

4. On March 30, 2010, about a week after the hearing, Defendants filed a Notice of Errata Re Oral Argument on March 22, 2010 and accompanying Declaration of Hugh T. Verano, Jr., Defendants' counsel. (hereafter, "Notice of Errata," Docket Item No. 874.) In the Notice of Errata, Defendants' counsel purports "to clarify certain statements made during oral argument." (*Id.*) On March 31, 2010, Plaintiffs filed an Objection to and Motion to Strike the Notice of Errata. (*See* Docket Item No. 875.) Civ. L.R. 7–3(d) pro-vides that "once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval." Here, Defendants did not receive Court approval before filing the Notice of Errata. The Rule makes no exception for post-hearing filings intended to clarify a party's position or statements made by counsel during oral argument. Despite his representations to the contrary, the Court finds that Defendants' counsel's attached declaration is in the nature of argument, and constitutes an improper attempt to file a surreply brief without leave of the Court in violation of Civ. L.R. 7–3(d). Counsel has had ample opportunity to state his client's position in written briefs and oral argument. Further, the Court does not rely on the statements counsel made at oral argument referenced in the Notice of Errata in resolving the present Motions, so clarification is unnecessary. Accordingly, the Court STRIKES Defendants' Notice of Errata.

5. (Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, hereafter, "December 5, 2006 Order," Docket Item No. 274.)

On December 22, 2006, Plaintiffs filed a Second Amended Complaint.[6]

On December 3, 2008, 254 F.R.D. 585 (N.D.Cal.2008), the Court granted Plaintiffs' Motion for Class Certification.[7] The Court certified Plaintiffs' classes for injunctive and declaratory relief, restitution, and for statutory damages under Rule 23(b)(2) and actual damages under Rule 23(b)(3). The Court certified Plaintiffs' Umbrella Class, FDCPA Subclass, CUBPA Subclass, and Bank Records Subclass as follows:

(1) Umbrella Class: All persons to whom ACCS mailed at least one demand letter purporting to be from a district attorney's office in California, attempting to collect a dishonored check, which was not returned as undeliverable.

(2) FDCPA Subclass: All members of the Umbrella Class, from whom ACCS after December 11, 2000 attempted to collect, or collected money for a check written for personal, family, or household purposes.

(3) CUBPA Subclass: All members of the Umbrella Class from whom ACCS attempted to collect, or collected money, after December 11, 1997.

(4) Bank Records Subclass: All members of the Umbrella Class whose bank records ACCS obtained after December 11, 1999.

On February 9, 2010, the Court approved the parties' Second Amended Joint Submission of Class Notice Plan. (Docket Item No. 819.) On March 11, 2010, Plaintiffs filed a report informing the Court that notices were sent to 179,241 class members. (Docket Item No. 859.)

### III. STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The non-moving party must then identify specific facts "that might affect the outcome of the suit under the governing law," thus establishing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

When evaluating a motion for summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court draws all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight that particular evidence is accorded. *See, e.g., Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). The court determines whether the non-moving

---

6. (Consolidated Complaint for Violation of the Fair Debt Collection Practices Act, the California Unfair Competition Law, the California Constitution [Art., I, Sec. 1], Misrepresentation and Conversion, hereafter, "SAC," Docket Item No. 283.)

7. (Order Granting Plaintiffs' Supplemental Motion for Class Certification, hereafter, "December 3, 2008 Order," Docket Item No. 18.)

party's "specific facts," coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party. *T.W. Elec. Serv. v. Pac. Elec. Contractors,* 809 F.2d 626, 631 (9th Cir.1987). In such a case, summary judgment is inappropriate. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Although the district court has discretion to consider materials in the court file not referenced in the opposing papers, it need not do so. *See Carmen v. San Francisco Unified School District,* 237 F.3d 1026, 1028–29 (9th Cir.2001). "The district court need not examine the entire file for evidence establishing a genuine issue of fact." *Id.,* at 1031. However, when the parties file cross-motions for summary

judgment, the district court must consider all of the evidence submitted in support of both motions to evaluate whether a genuine issue of material fact exists precluding summary judgment for either party. *The Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1135 (9th Cir.2001).

## IV. DISCUSSION

### A. Liability of Individual Defendants Under the FDCPA

■ Defendants move for summary judgment on the grounds that Defendants Mealing and Hasney cannot be held liable under the FDCPA because (1) the FDCPA did not apply to ACCS' activities as a private contractor implementing a bad check diversion program,[8] and (2) Defendants Mealing and Hasney were not debt collectors within the meaning of the FDCPA because they were removed from ACCS'˙ day-to-day collection activities.[9] The Court addresses each of Defendants' contentions in turn.[10]

8. (Defendant Mealing's Motion at 8–15; Defendant Hasney's Motion at 7–15.)

9. (Defendant Mealing's Motion at 15–29; Defendant Hasney's Motion at 15–29.) Defendants also contend that Plaintiffs' claims are time-barred as against Defendant Mealing. (Defendant Mealing's Motion at 29.) In light of the Court's finding that Defendant Mealing materially participated in debt collection activities throughout the class period, as discussed more fully below, the Court finds that Plaintiffs' claims against Defendant Mealing are not time-barred.

10. As a preliminary matter, on March 9, 2010, Plaintiffs filed a Motion *in Limine* to Exclude Declarations of Witnesses that Defendants Did Not Disclose Pursuant to Fed. R.Civ.P. 26(a). (hereafter, "Objection Re Undisclosed Witnesses," Docket Item No. 854.) For purposes of the present Motions, the Court construes the Motion in Limine as an evidentiary objection. Plaintiffs seek exclusion of the declarations of the following witnesses submitted in opposition to Plaintiffs' Motion: (1) Eric Brown, (2) John Franco, (3)

Mark A. Hake, (4) Kelly Keahey, (5) Penny Mateer, (6) Robert Pressley, (7) Michael Ramos, (8) Michael Smith, (9) Farideh Toosky, (10) Gregory Totten. (*Id.* at 1–2.) The Court finds that to the extent Defendants have not disclosed any of the ten witnesses pursuant to Fed.R.Civ.P. 26(a), their declarations are only admissible for purposes of impeachment. Fed.R.Civ.P. 26(a)(3). However, because the Court does not rely on any of the ten declarations to which Plaintiffs object in resolving the present Motions, Plaintiffs' Objection is OVERRULED as moot.

On March 12, 2010, Plaintiffs filed Objections to Non–Party Declarations and Documents filed by Defendants in Opposition to Plaintiffs' Motion for Summary Judgment and Injunctive Relief. (hereafter, "Objections Re Documents," Docket Item No. 862.) In addition to raising additional objections to several of the witness declarations discussed in footnote 5, Plaintiffs seek to exclude multiple documents submitted in opposition to Plaintiffs' Motion, most of which are letters from various state attorney general offices offering informal legal opinions as to the propriety of

Congress enacted the FDCPA to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). "Debt" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692(a)(5). A "debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692(a)(6).

### 1. Effect of 2006 Amendment to FDCPA

Defendants contend that the 2006 Amendment to the FDCPA clarifies that private contractors like ACCS who meet specific conditions and act solely as the agents of the prosecuting attorney in administering bad check programs are exempt from liability under the statute.[11]

 The Court has found in two prior Orders that ACCS was a private actor attempting to take action to collect a debt against private individuals in order to compensate third party creditors, and thus,

---

bad check diversion programs under the laws of those respective states. The Court does not rely on any of these letters or other documents in resolving the present Motions, thus the Court OVERRULES as moot Plaintiffs' Objections Re Documents.

On March 1, 2010, Plaintiffs filed Objections to Declaration of George Kennedy, Dated March 3, 2006 in Support of Opposition to Defendants' Motions for Summary Judgment and to Affidavit of Stephen Gibbons, Dated July 13, 2007 in Support of Opposition to Defendants' Motions for Summary Judgment. (Docket Item Nos. 842, 843.) Since the Court does not rely on either in resolving the present Motions, the Court OVERRULES as moot Plaintiffs' Objections.

On March 1, 2010, Defendants filed Objections to Plaintiffs' Evidence. (hereafter, "Defendants' Objections," Docket Item No. 836.) Defendants object to the Declaration of Paul Arons on the ground, *inter alia*, that it fails to properly authenticate the attached documents and constitutes inadmissible hearsay. (*Id.* ¶¶ 4–69.) Defendants do not dispute that all of the attached documents were provided to Plaintiffs by Defendant ACCS during the course of discovery. (*See* Declaration of Paul Arons in Support of Plaintiffs' Motion for Summary Judgment and Injunction Against Don Mealing, Lynn Hasney and Inc. Fundamentals, hereafter, "Arons Decl.," Docket Item No. 818.) Although "documents do not automatically become a part of the record simply because they are the product of discovery," here, Plaintiffs entered the documents into the summary judgment record and attested to their authenticity, in contrast to *Hoffman v. Applicators Sales and Service, Inc.*, the case relied on by Defendants. 439 F.3d 9, 15 (1st Cir.2006). Since Defendants do not specify any reason to doubt the authenticity of documents that they themselves produced in discovery, the Court finds the documents properly authenticated under Fed.R.Evid. 901. Furthermore, the Court does not rely on any of the challenged documents for the truth of their contents. Accordingly, the Court OVERRULES Defendants' Objections with regard to the Declaration of Paul Arons and related exhibits.

Finally, Defendants object to multiple documents under the category "Appendix 1." (*Id.* ¶¶ 70–96.) Defendants seek to exclude documents relating to contracts with several California counties. Since the Court does not rely on any of these documents in resolving the present Motions, Defendants' Objections with respect to those documents are OVERRULED as moot.

11. (Defendant Mealing's Motion at 8–15; Defendant Hasney's Motion at 7–15.)

was bound by the requirements of the FDCPA.[12] Defendants contend that the Court's prior rulings in this regard are inapplicable to the present motions for summary judgment because the Court made its findings in the context of Rule 12(b) motions, and thus the Court was obligated to take the pleadings in the Complaint as true.[13] The Court finds, however, that its prior holding regarding the applicability of the FDCPA to ACCS' activities was a matter of law and undisputed fact, and is thus unaffected by the procedural posture of the case. Under the law of the case doctrine, "a court should not reopen issues decided in earlier stages of the litigation." *Agostini v. Felton,* 521 U.S. 203, 236, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997): *see also One Indus., LLC v. Jim O'Neal Distrib., Inc.,* 578 F.3d 1154, 1159 (9th Cir.2009). However, since the Court's findings were based in part on the lack of a statutory exemption for private actors under contract with local government entities, the Court will consider the effect of Congress' recent Amendment providing such an exemption.

The 2006 Amendment to the FDCPA provides that if certain procedural safeguards are met, a private entity operating a pretrial diversion program for alleged bad check offenders shall be excluded from the definition of a debt collector. 15 U.S.C. § 1692p.

As an initial matter, there is no indication in the statutory language that the exemption provided in Section 1692p applies retroactively. *See Schwarm v. Craighead,* 552 F.Supp.2d 1056, 1069 (E.D.Cal.2008) ("With § 1692p, defendant

cannot overcome the presumption against retroactive application of statutes because neither the statute nor its brief legislative history suggest that Congress intended the statute to apply retroactively."). Thus, the Amendment is only relevant as far is it provides insight into Congress' intent with regard to the status of private contractors operating diversion programs at the time of the FDCPA's passage. To that end, the Court finds that Section 1692p's enumeration of multiple specific criteria that a check collector must satisfy to qualify for the exemption demonstrates that Congress did not merely intend to clarify a previously held understanding that private contractors operating diversion programs are not debt collectors within the meaning of the statute. Instead, the statute's inclusion of numerous procedural safeguards illustrates Congress' intent to create a new framework that recognizes the role of private entities in operating diversion programs while protecting consumers from abusive practices.

Since Section 1692p does not apply retroactively and does not evidence congressional intent to generally exclude private contractors operating diversion programs from the FDCPA's definition of debt collector, the Court finds that Congress' enactment of the Amendment does not impact the Court's prior finding that ACCS was a debt collector subject to the FDCPA.

### 2. Individual Defendants' Debt Collector Status

■ Defendants contend that Defendants Mealing and Hasney were not debt

---

**12.** (December 5, 2006 Order at 903; Order Granting in Part and Denying in Part Defendants' Motion to Dismiss at 6, Docket Item No. 23.) Clear Ninth Circuit precedent holds that "[a] dishonored check constitutes an FDCPA 'debt,' and therefore the FDCPA prohibits check collectors from using abusive

practices." *Charles v. Lundgren & Assocs.,* 119 F.3d 739, 742 (9th Cir.1997).

**13.** (Opposition of Defendants Donald R. Mealing, Lynn R. Hasney and Inc. Fundamentals to Plaintiffs' Motion for Summary Judgment at 4, hereafter, "Defendants' Opposition," Docket Item No. 827.)

collectors, as the term is defined by the FDCPA, because (1) neither of them are alter egos of ACCS,[14] and (2) neither of them materially participated in any debt collection activity.[15] The Court considers each issue in turn.[16]

### a. Alter Ego Theory

At issue is whether individual Defendants can be held liable for violating the FDCPA without a showing that they are alter egos of ACCS.

■ In its December 5, 2006 Order, the Court directly addressed Defendants' contention that the individual Defendants could not be held liable because Plaintiff del Campo did not allege sufficient facts to pierce the corporate veil. (Dec. 5, 2006 Order at 903–04.) Despite the Court's clear ruling on the issue as a matter of law, Defendants renew their contention in the present motion in asserting that Plaintiffs have failed to raise a triable issue that any individual Defendant is an alter ego of ACCS. As in its prior Order, the Court here follows the numerous courts that

have held that under the plain language of the FDCPA, an individual can be considered a "debt collector" and be held personally liable without piercing the corporate veil if the individual materially participated in the debt collection activities.[17] Although the Ninth Circuit has yet to address the issue directly, the Sixth Circuit has recently held that the corporate structure does not insulate shareholders, officers, or directors from personal liability under the FDCPA. *Kistner v. Law Offices of Michael P. Margelefsky, LLC,* 518 F.3d 433, 437–38 (6th Cir.2008).

While the Court acknowledges that there is a split of authority on the issue of individual liability of corporate officers and directors under the FDCPA, there has been no change in the law since the Court issued its December 5, 2006 Order that would lead the Court to reconsider its prior holding and adopt the Seventh Circuit's view. *See, e.g., White v. Goodman,* 200 F.3d 1016, 1019 (7th Cir.2000). Thus, the Court finds that individual Defendants may be liable for violating the FDCPA

---

**14.** (Defendant Mealing's Motion at 19–27; Defendant Hasney's Motion at 18–26.)

**15.** (Defendant Mealing's Motion at 27; Defendant Hasney's Motion at 26.)

**16.** Defendants additionally contend that a recent district court decision from Indiana precludes any finding of liability against individual Defendants here. (Defendants' Motion at 15–19.) In *Hamilton v. American Corrective Counseling Services, Inc.,* a case involving the same Defendants as this case, the court found that individual Defendants "cannot be liable for any FDCPA violations ACCS may have committed." 2009 WL 3245194 at *13, 2009 U.S. Dist. LEXIS 91033, at *39 (N.D.Ind. Sept. 30, 2009). Under the doctrine of res judicata, a claim is barred by prior litigation when "the earlier suit ... (1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies." *Mpoyo v. Litton Electro–Optical Systems,* 430 F.3d 985, 987 (9th Cir.2005).

Since Plaintiffs here were not parties or privies to the *Hamilton* case, the Court finds that their FDCPA claim is not precluded by res judicata. Furthermore, the *Hamilton* court explicitly relied on the Seventh Circuit veil-piercing test for individual FDCPA liability that this Court has declined to adopt. *Hamilton,* 2009 WL 3245194 at *13, 2009 U.S. Dist. Lexis 91033, at *39 ("Because no reasonable trier of fact could find that the separateness of these entities had ceased, California law requires that the corporate form be observed."). Thus, the holding of that case does not bear on the Court's decision here.

**17.** *See Schwarm,* 552 F.Supp.2d at 1070–71; *Brumbelow v. Law Offices of Bennett and Deloney, P.C.,* 372 F.Supp.2d 615, 618 (D.Utah 2005); *Albanese v. Portnoff Law Assocs., Ltd.,* 301 F.Supp.2d 389, 400 (E.D.Pa.2004); *Brink v. First Credit Res.,* 57 F.Supp.2d 848, 862 (D.Ariz.1999): *Ditty v. CheckRite, Ltd., Inc.,* 973 F.Supp. 1320, 1336–37 (D.Utah 1997); *Newman v. Checkrite Cal., Inc.,* 912 F.Supp. 1354 (E.D.Cal.1995).

regardless of whether Plaintiffs can establish that they are alter egos of ACCS.

### b. Material Participation in Debt Collection Activities

■ At issue is whether there is a triable issue of fact as to whether Defendants Mealing and Hasney materially participated in the debt collection activities of ACCS, and thus may be held individually liable under the FDCPA.

Courts have found individuals personally liable as debt collectors under the FDCPA when they (1) materially participated in collecting a debt,[18] (2) "exercise[d] control over the affairs of [a debt collection] business,"[19] or (3) were "regularly engaged, directly and indirectly, in the collection of debts." *Kistner*, 518 F.3d at 438.

### i. Defendant Mealing

Plaintiffs present the following evidence, *inter alia*, that Defendant Mealing was sufficiently involved in ACCS' debt collection activities to subject him to FDCPA liability: (1) an interrogatory answer stating, in reference to Defendant Mealing's activities during the 1997–2004 class period,

> As an officer, shareholder and/or director of ACCS Mealing was responsible for the overall success of the company. On behalf of ACCS, Mealing developed business, identified growth strategies and implemented plans to achieve those strategies. Mealing set objectives for

ACCS' profitability and ensured ACCS met those objectives. Mealing also assisted many California district attorneys as they developed their misdemeanor pre-trial diversion programs. Specifically, he met with district attorneys that contracted with ACCS as they drafted, revised and approved form letters to be sent to bad check writers. Mealing also had extensive meetings with district attorneys in which they reviewed policies and procedures created and approved by the district attorneys, the purpose of these meetings and policies was to ensure that ACCS was informed of and followed all of the district attorneys' protocols. From 2002 to July 2004, Paul Fischer replaced Mealing as president and CEO. Mealing reassumed the position as CEO for a few months prior to the sale of ACCS in November 2004 to help position ACCS for the sale.[20]

(2) Defendant Mealing's declaration in *Hamilton v. American Corrective Counseling Services, Inc.*[21] that "[o]n behalf of ACCS, [he] met with the prosecuting attorneys in various jurisdictions ... to review and prepare all correspondence and course material used in the prosecutors' diversion programs";[22] (3) Defendant Mealing's declaration that he "served as a support for [VP of Sales and Marketing] Mr. Barrus' marketing activities, accompanying him on those few trips when there was a need for a high level meeting with an influential District Attorney or County Supervisor";[23] (4) Defendant Mealing's

---

**18.** *See Brink*, 57 F.Supp.2d at 862. In its December 5, 2006 Order, the Court also found that individual Defendants were liable as debt collectors if they materially participated in debt collection activities. (*See* December 5, 2010 Order at 15.)

**19.** *Piper v. Portnoff Law Assocs.*, 274 F.Supp.2d 681, 690 (E.D.Pa.2003).

**20.** (Response to Interrogatory No. 8, Defendant Don R. Mealing's Response to Plaintiffs' Interrogatories [Set One], hereafter, "Mealing Interrog. Response," Docket Item No. 850.)

**21.** 2009 WL 3245194, 2009 U.S. Dist. LEXIS 91033.

**22.** (Declaration of Don R. Mealing in Support of Co–Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment ¶ 7; Plaintiffs' Motion, Ex. 56.)

**23.** (Declaration of Donald R. Mealing in Opposition to Plaintiffs' Motion for Summary Judgment ¶ 85, hereafter, "Mealing Opp'n Decl.," Docket Item No. 832.)

declaration that "[a]s principal shareholder during the class period, [he] signed the majority of contracts as they were presented by the marketing and sales teams";[24] (5) Defendant Mealing's declaration that he personally interceded with the San Diego District Attorney in an "attempt to warn her of potential fallout" from a situation involving the Bad Check Diversion Program;[25] (6) Defendant Mealing's declaration that he communicated directly with the Los Angeles District Attorney "[w]hen there was a significant issue at hand," and then delegated the follow-up to a subordinate;[26] and (7) Defendant Mealing's declaration that he "personally hired counsel to review the Official Notices [that were sent to check writers] and make proposed edit changes."[27]

■ In response, Defendants present the following evidence to show that as of December 1997, Defendant Mealing's involvement in ACCS was minimal:[28] (1) Defendant Mealing's declaration that there were layers of management between him and the employees who were actually dealing with bad check writers;[29] (2) declarations of Defendants Mealing and Hasney stating that Defendant Mealing was essentially an "absentee owner" who was rarely in the office, did not have a secretary, did not supervise or train the staff, and had delegated substantial control over the business to subordinates;[30] and (3) declarations of Defendants Mealing and Hasney stating that Defendant Mealing's involvement in ACCS was limited to infrequently "tagging along" on a sales call, occasionally signing a new contract, assisting the defense of six class action lawsuits around the country, "fending off" state attorney general inquiries initiated by ACCS' competitors, lobbying Congress and state legislators to clarify the law, and positioning ACCS for a sale.[31]

The Court finds that it is undisputed that Defendant Mealing was the highest ranking officer in ACCS until 2002, and

24. (*Id.* ¶ 88.)

25. (*Id.* ¶ 92.)

26. (*Id.* ¶ 93.)

27. (*Id.* ¶ 101.)

28. Plaintiffs object to multiple portions of both of Defendant Mealing's declarations. (*See* Plaintiffs' Objections to Declaration of Don Mealing in Support of Opposition to Defendants' Motions for Summary Judgment, Docket Item No. 841; Plaintiffs' Objections to Declaration of Don R. Mealing, and Motion to Strike Sham Testimony, Docket Item No. 863.) Plaintiffs object to Defendant Mealing's February 6, 2010 Declaration on grounds of relevancy, foundation, hearsay, and improper opinion testimony. (Docket Item No. 841.) Plaintiffs raise similar objections to Defendant Mealing's March 1, 2010 Declaration, and object on the additional ground that the declaration constitutes a "sham affidavit" because it contradicts prior deposition testimony. (Docket Item No. 863.) "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir.1991). Given the importance of Defendant Mealing's testimony as a party witness, the Court finds good cause to consider both of his declarations in their entirety for the purpose of determining whether there is a genuine issue of fact that would warrant trial. However, because the Court finds that Defendant Mealing's declarations do not create any triable issue of fact, the Court OVERRULES Plaintiffs' Objections.

29. (Declaration of Donald R. Mealing ¶¶ 3–10, 16–17, 19–20, 23–24, 36, 38, 41, hereafter, "Mealing Decl." Docket Item No. 805.)

30. (*Id.* 119–10, 16–17, 19–20, 23–24, 36, 38, 41; Declaration of Lynn R. Hasney in Support of Donald R. Mealing's Motion for Summary Judgment ¶¶ 3–6, hereafter, "Hasney Decl.," Docket Item No. 805.)

31. (Mealing Decl. ¶¶ 174–204; Hasney Decl. ¶¶ 171–76.)

that throughout the class period, he continued to play a critical role in the company's operations. While Defendant Mealing has presented some evidence that he curtailed his day-to-day involvement with ACCS after December 1997, the company continued to rely on him for high-level communications with district attorneys and other elected officials, by any measure a significant function for a company whose very existence depended upon its relationships with such officials. Although the evidence shows that Defendant Mealing had delegated substantial authority to subordinates during the class period, it is undisputed that Defendant Mealing continued to sign all sales contracts, indicating that he never relinquished ultimate control over the Company's operations. Furthermore, it appears to the Court that Defendant Mealing's more recent declaration indicates a lower level of involvement in ACCS' daily operations than his earlier interrogatory response.[32] Defendant Mealing cannot create a triable issue of fact by contradicting his prior testimony. *Bodett v. Cox-Com, Inc.*, 366 F.3d 736, 748 (9th Cir.2004).

■ The Court finds that by any of the three measures outlined above, Defendant Mealing was a debt collector as defined by the FDCPA: he materially participated in collecting debt by occupying a position of critical importance to ACCS' business; as the CEO and primary shareholder in ACCS, he exercised control over the affairs of a debt collection business; and he was regularly engaged, albeit more often indirectly than directly, in the collection of debts through his involvement in ACCS' affairs. There is no requirement under the FDCPA that a debt collector must be the contact point between the company and the debtor—indirect participation in the debt collection process is sufficient. However infrequent or arm's length his involvement in the Company, the evidence unequivocally demonstrates that Defendant Mealing continued to play a key role in maintaining and expanding ACCS' debt collection activities throughout the class period.

Accordingly, the Court finds that Defendant Mealing may be held individually liable for violating the FDCPA.

### ii. Defendant Hasney

■ Plaintiffs present the following evidence, *inter alia*, that Defendant Hasney was sufficiently involved in ACCS' debt collection activities to subject her to FDCPA liability: (1) Defendant Hasney's declaration that her duties "were to oversee ACCS' operations as a whole inclusive of the education department";[33] (2) Defendant Hasney's declaration that until about 2003, many ACCS department heads reported directly to Hasney, including the recovery department manager, the case management department manager, the information services director, the accounting department manager, and the education department manager;[34] (3) Defendant Hasney's declaration that as ACCS' Chief Financial Officer, she was involved in finding ways to increase revenue, including by raising class and program fees;[35] and (4) Defendant Hasney's declaration that after ACCS was sued in 2000 in Iowa, Defendant Hasney and Defendant Mealing together restructured ACCS and then executed contracts to manage ACCS' check restitution program.[36]

---

**32.** (Compare Mealing Decl., with Mealing Interrog. Response No. 8.)

**33.** (Declaration of Lynn R. Hasney in Opposition to Plaintiffs' Motion for Summary Judgment ¶ 106, hereafter, "Hasney Opp'n Decl.," Docket Item No. 832.)

**34.** (*Id.* ¶ 111.)

**35.** (*Id.* ¶ 119.)

**36.** (*Id.* ¶ 130.)

In response, Defendants present evidence that Defendant Hasney only performed high-level executive functions for ACCS and was not directly involved in the company's day-to-day debt collection activities.[37] In her declaration, Defendant Hasney described her role at ACCS as follows: (1) her duties included managing the finances of the business and coordinating operating systems with the company's district attorney clients, personnel administration, and supervising the information technology staff;[38] (2) she was responsible for the overall financial and tax reporting functions, had the authority to hire and fire personnel without Defendant Mealing's consent, oversaw the budgeting process within each department, and was responsible for the "high-level" day-to-day operations, such as interfacing with the department heads and dealing with the company's finances;[39] (3) the ACCS department managers who were responsible for the lower-level day-to-day operations of ACCS reported to Defendant Hasney directly.[40]

It is undisputed that next to Defendant Mealing, Defendant Hasney occupied the highest position of authority in ACCS. Defendant Mealing himself declared that he treated Defendant Hasney as his "business *partner*." (Mealing Opp'n Decl. ¶ 109 (emphasis in original).) Although Defendant Hasney did not herself perform the day-to-day debt collection activities of the company, the employees who did reported to her directly. It is further undisputed that Defendant Hasney was primarily responsible for the company's financial well-being and growth, without which none of ACCS' debt-collection activities would be possible.

Since the FDCPA explicitly includes those who indirectly participate in debt collection activities within the definition of debt collector, Defendant Hasney cannot insulate herself from FDCPA liability by pointing to the layers of mid-level managers between her and the front line employees who carry out the company's day-to-day operations. Shielding executives like Defendant Hasney from liability while holding accountable low-level workers who are merely carrying out the directives of those executives would fly in the face of the FDCPA's goal of eliminating abusive debt-collection practices.

The Court finds that by any of the three standards outlined above, Defendant Hasney was a debt collector as defined by the FDCPA: she materially participated in collecting debt through her involvement in ACCS' high-level day-to-day activities; as company CFO and the individual charged with overseeing all of ACCS' operations, she exercised control over the affairs of a

---

**37.** Plaintiffs object to multiple portions of both declarations of Lynn R. Hasney. (Plaintiffs' Objections to Declaration of Lynn R. Hasney, Docket Item No. 844; Plaintiffs' Motion to Strike Certain Testimony and Objections to Declaration of Lynn R. Hasney, Docket Item No. 866.) Plaintiffs object to Defendant Hasney's February 8, 2010 Declaration on grounds of relevancy, foundation, hearsay, and improper opinion testimony. (Docket Item No. 844.) Plaintiffs object to Defendant Hasney's March 1, 2010 declaration on similar grounds, but also contend that the ground that much of her testimony is not responsive to the allegation or allegations cited and is in the nature of argument. (Docket Item No. 866.) Given the importance of Defendant Hasney's testimony as a party witness, the Court finds good cause to consider both of Defendant Hasney's declarations in their entirety to determine whether there are any genuine issues of fact that warrant trial. Since the Court finds that Defendant Hasney's declarations do not create any triable issue of fact, the Court OVERRULES Plaintiffs' Objections as to Defendant Hasney's two declarations.

**38.** (Hasney Decl. ¶ 2.)

**39.** (*Id.* ¶ 3.)

**40.** (*Id.*)

debt collection business; and she was regularly engaged, at least indirectly, in the collection of debts through her supervision of the company's front-line managers. *See Albanese v. Portnoff Law Assocs., Ltd.,* 301 F.Supp.2d 389, 400 (E.D.Pa.2004) (finding the defendant company's president individually liable under FDCPA where her duties "include supervising the staff and the overall operations of the firm").

Accordingly, the Court finds that Defendant Hasney may be held individually liable for violating the FDCPA.

### B. *Liability of Inc. Fundamentals Under the FDCPA*

 Plaintiffs contend that Inc. is directly liable for any FDCPA violations from December 1, 2000, the date of its formation, through the sale of ACCS on November 10, 2004 because it provided restitution services to ACCS through a newly-formed partnership. (Plaintiffs' Motion at 18.) Defendants contend that Inc. had no direct involvement with any ACCS operations, and that its sole business purpose was to finance start-up businesses. (Defendants' Opposition at 15.)

It is undisputed that at all relevant times, Defendant Mealing was the President of Inc., which is a Subchapter S corporation owned by an Employee Stock Ownership Plan ("ESOP") of which Defendant Mealing is the sole beneficiary. (Mealing Opp'n Decl. ¶¶ 151, 180.) It is also undisputed that Defendant Mealing formed Inc. in 2000, and Inc. subsequently entered into a general partnership with another Subchapter S corporation, which is owned by an ESOP of which Defendant Hasney is the sole beneficiary. (*Id.* ¶ 180.) The general partnership was called Fundamental Performance Strategies ("FPS").

(*Id.*) Inc. had no direct relationship with ACCS. (*Id.* ¶ 150.) FPS, however, had a contractual relationship with ACCS which required FPS to provide services connected with such matters as ACCS litigation defense coordination, and legislative strategy and coordination. (*Id.* ¶ 155.) FPS was compensated by ACCS in exchange for the services it provided, and Inc. received revenue as a partner in FPS. (*Id.*)

On December 1, 2000, Defendant Mealing entered into a full-time employment contract with Inc., requiring Defendant Mealing to perform services including: (1) marketing analysis, (2) program design and development, (3) program marketing, and (4) lobbying.[41] FPS subsequently entered into an independent contractor agreement with ACCS, which was amended on November 9, 2001, requiring FPS to provide "Management and Program Consulting Services."[42] These services included services related to establishing and maintaining business relations with state and local prosecutors and other government officials, services related to the defense of existing and future civil litigation and regulatory actions, services related to the marketing of programs to district attorneys, and services related to the examination of client data followed by the design and development of new counseling, restitution, and related programs. (*Id.* § 1.1.1.)

Since there is no evidence that Inc. had a direct contractual relationship with ACCS, or directly provided services to ACCS relating to debt collection, the Court cannot find as a matter of law that Inc. was a debt collector as defined by the FDCPA. However, the evidence unequivocally shows that Defendant Mealing entered into a full-time employment contract

---

41. (Agreement of Employment § 1, Plaintiffs' Motion, Ex. 50.)

42. (First Amendment to Independent Contractor Agreement for Management and Program Consulting Services, *id.,* Ex. 51.)

with Inc. requiring him to perform what appear to be many of the same functions that he engaged in while working for ACCS directly. Furthermore, FPS, a company in which Inc. was a general partner, contracted directly with ACCS to perform functions that directly involved ACCS' debt collection operations. While there is no direct evidentiary link between Inc.'s employment contract with Defendant Mealing and FPS's management and program consulting contract with ACCS, the Court finds sufficient circumstantial evidence to create a genuine issue of material fact as to whether Inc. materially participated in ACCS' debt collection activities.

Accordingly, the Court DENIES the parties' cross-motions to adjudicate Inc.'s FDCPA liability.

### C. *FDCPA Violations*

■ Having determined the various Defendants' respective potential liability under the FDCPA, the issue becomes whether ACCS' debt collection activities violated any of the FDCPA's consumer protection provisions. Plaintiffs contend that Defendants violated the FDCPA by (1) charging fees not permitted under California law, (2) sending letters on district attorney letterhead without disclosing the true identity of the sender, (3) making false threats of prosecution, and (4) failing to include required notices in communications to check writers.[43]

The Ninth Circuit has found that "one action can give rise to multiple violations of the [FDCPA]." *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir.2006). The FDCPA provides that a debt collector may be held liable for failing to comply with any of its substantive provisions. 15 U.S.C. § 1692k(a). Thus, a court may enter summary judgment in a plaintiff's favor with regard to a

defendant's liability under the FDCPA upon finding a single violation. *See Schwarm*, 552 F.Supp.2d at 1074. To determine damages, however, the court must consider "the frequency and persistence of noncompliance by the debt collector [and] the nature of such noncompliance." *See* § 1692k(b)(2).

■ When evaluating whether a debt collector violated the FDCPA, the court "focuses on the debt collector's actions, and whether an unsophisticated consumer would be harassed, misled or deceived by them." *Freyermuth v. Credit Bureau Servs., Inc.*, 248 F.3d 767, 771 (8th Cir.2001). "The FDCPA is a strict liability statute. Plaintiffs need not prove either that [d]efendants knew that their debt collection practices violated the law or that they intended to violate the law." *Irwin v. Mascott*, 112 F.Supp.2d 937, 963 (N.D.Cal. 2000). "Plaintiffs are not required to prove that consumers suffered any actual damages, in order to prove [d]efendants' liability for FDCPA violations." *Id.*

■ In the Ninth Circuit, whether a debt collector's communication violates the FDCPA "depends on whether it is likely to deceive or mislead a hypothetical least sophisticated debtor." *Terran v. Kaplan*, 109 F.3d 1428, 1431 (9th Cir.1997) (internal quotations omitted). "The objective least sophisticated debtor standard is lower than simply examining whether particular language would deceive or mislead a reasonable debtor." *Id.* at 1431–32 (internal quotation omitted). "Whether a communication would 'confuse a least sophisticated debtor,' thereby violating the FDCPA, is a question of law." *Schwarm*, 552 F.Supp.2d at 1074 (quoting *Terran*, 109 F.3d at 1432).

---

**43.** (*See* Reply Memorandum in Support of Plaintiffs' Motion for Summary Judgment, hereafter, "Plaintiffs' Reply," Docket Item No. 852.)

The Court considers each of Defendants' alleged FDCPA violations in turn.

### 1. Charging Fees Not Permitted Under California Law

Plaintiffs contend that collection letters that ACCS sent to check writers demanded fees not authorized by California law. (Plaintiffs' Motion at 18–21.)

The FDCPA provides that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C § 1692f. The statute further specifies that it is a violation to collect "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* § 1692f(1). Pursuant to § 1692f(1), "the collection of any amount over the face amount of a dishonored check is prohibited unless the excess amount is expressly authorized by the agreement creating the debt or permitted by law." *Irwin v. Mascott,* 96 F.Supp.2d 968, 980 (N.D.Cal.1999). "The burden of proving a statutory exception falls on the party seeking to reap the benefit of the exception." *Id.; see also Schwarm,* 552 F.Supp.2d at 1080 ("To establish that a particular fee does not violate § 1692f(1), the debt collector must identify a state law that authorizes the fee.").

During the class period, California's Bad Check Diversion Act ("BCDA") provided that a district attorney, or a private company contracting with the district attorney, could collect two fees: (1) a processing fee

not to exceed $35 for each bad check, and (2) actual bank charges not exceeding $10, which must be paid to the victim. *See* Cal.Penal Code § 1001.65.[44] Here, it is undisputed that each Plaintiff received an "Official Notice" letter from ACCS on district attorney letterhead seeking payment of the check amount, a returned item fee of $10, an administrative fee of $35, and a "program fee" ranging from $125 to $140.[45] While the returned item fee and administrative fee are clearly authorized under the BCDA, Defendants do not point to any state law that would permit them to charge a program fee. Although Defendants contend that all of the fees sought in the notices were approved in advance by each district attorney,[46] a fee is not permitted by law simply because a district attorney says it is.

Accordingly, the Court finds that Defendants Mealing and Hasney, through their material participation in ACCS' debt collection activities, violated the FDCPA when they sought from Plaintiffs and class members program fees that were not permitted by law.[47]

### 2. Sending Letters on District Attorney Letterhead

Plaintiffs contend that the letters ACCS sent to check writers violated the FDCPA by failing to identify ACCS as the sender. (Plaintiffs' Motion at 22–23.)

The FDCPA provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of

---

**44.** In a 2008 amendment, the allowable fees were increased to $50 and $15 respectively. Section 1001.65(b) allows for further fees to be imposed after conviction.

**45.** (SAC, Exs. 1, 3, 4, 6, 7, 12; Defendants' Answer to Amended Consolidated Complaint ¶¶ 30, 36, 39, 44, 60, hereafter, "Defendants' Answer," Docket Item No. 297.)

**46.** (Defendants' Opposition at 8.)

**47.** Since the Court finds that there is a triable issue of fact as to whether Defendant Inc. was a statutory debt collector, Inc.'s liability for violating the FDCPA will depend on the ultimate finding of fact as to its material participation in ACCS' debt-collection activities.

any debt." 15 U.S.C. § 1692e. The statute further specifies that it is a violation to falsely represent or imply "that any individual is an attorney or that any communication is from an attorney." *Id.* § 1692e(3). "A debt collector violates this section of the FDCPA when a letter appears to be sent by an attorney without the attorney's having both reviewed the debtor's file and gained some knowledge about the specific debt." *Irwin,* 112 F.Supp.2d at 937; *see also Avila v. Rubin,* 84 F.3d 222, 228 (7th Cir.1996) ("[A]n attorney sending dunning letters must be directly and personally involved in the mailing of the letters in order to comply with the strictures of FDCPA."). A debt collector also violates the FDCPA when using or distributing "any written communication which . . . creates a false impression as to its source, authorization, or approval." 15 U.S.C. § 1692e(9). Finally, a debt collector commits a violation when using "any business, company, or organization name other than the true name of the debt collector's business, company, or organization." *Id.* § 1692e(9).

Here, it is undisputed that the Official Notices that ACCS sent to check collectors were on district attorney letterhead, were signed by a criminal investigator from the Santa Clara County District Attorney's Office, and listed the Santa Clara County District Attorney Bad Check Restitution Program in the address for remission of payments.[48] Nowhere on the official notice is there any indication that the actual source of the letter is ACCS. Furthermore, there is no evidence that the district attorney's office reviewed each file prior to ACCS sending each letter or was directly involved in the mailing of the letters. Defendants contend that the district attorneys authorized them to send the notices on district attorney letterhead and on the district attorney's behalf. (Defendants'

Opposition at 8.) The Court finds, however, that the district attorney's permission does not excuse defendants from adhering to the requirements of the FDCPA. At the very least, the law requires that ACCS identified itself as the true sender of the letter.

Since on their face, the Official Notices do not disclose the identity of the actual sender, and create the impression that they were sent directly from the district attorney's office rather than from a private company, the Court finds that ACCS and those individuals who materially participated in its check collection operations violated the FDCPA.

### 3. False Threats of Prosecution

■ Plaintiffs contend that ACCS' check-collection letters threatened arrest and prosecution where no individual assessment had been made as to whether that threat would actually be carried out. (Plaintiffs' Motion at 23–25.)

The FDCPA provides that it is a violation to represent or imply that "nonpayment of any debt will result in the arrest or imprisonment of any person . . . unless such action is lawful and the debt collector or creditor intends to take such action." A statement in a debt collection letter may constitute a threat to take legal action if it is "calculated to intimidate the least sophisticated consumer into believing that legal action against her is imminent" and "that the debtor's only options are either payment or being sued." *Irwin,* 112 F.Supp.2d at 951–52. "A false threat to take action may be established by showing that no assessment has been made as to whether the threat will be carried out." *Id.* at 952.

Here, the Official Notice letter sent to check writers states:

---

**48.** (SAC, Exs. 1, 3, 4, 6, 7, 12; Defendants' Answer ¶¶ 30, 36, 39, 44, 60.)

The Santa Clara County District Attorney's Office has received an INCIDENT REPORT alleging that you have violated Penal Code 476(a) of the California State Statute: Passing a Worthless Check. A conviction under this statute is punishable by up to six (6) months in county jail and up to $1,000 in fines. . . . YOU MAY AVOID A COURT APPEARANCE if you agree to enroll in the Santa Clara County District Attorney's Bad Check Restitution Program. . . . The District Attorney is extending an opportunity to participate in a pre-trial misdemeanor diversion program as an alternative to appearing in Court.[49]

Another notice letter sent to check writers states, "Due to your failure to complete the requirements of the District Attorney's Bad Check Restitution Program as specified in previous notices, we are now initiating formal prosecution proceedings against you. Criminal charges of PC 476a, 'Passing a Worthless Check,' are being prepared for review by a deputy prosecutor." (SAC, Exs. 14–19.)

The Court finds that an unsophisticated recipient of either of the above-quoted letters would likely conclude that failure to pay the amount requested in the letter would result in criminal prosecution. Thus, the issue becomes whether ACCS had the intent or legal ability to prosecute the individuals to whom they sent the letters. Defendant Mealing admits that "ACCS had no control over which cases would have been prosecuted." (Mealing Opp'n Decl. ¶ 46.) Defendants present no evidence, however, that any individual assessment of whether the district attorney would prosecute a given check-writer occurred prior to sending the Official Notice letter. Defendants' contend that ACCS referred thousands of cases to the district attorney for prosecution during the class

period. (Defendants' Opposition at 9.) Even if true, however, the total number of prosecution referrals standing alone does not show that ACCS individually assessed each case before threatening prosecution. The Court's concern lies with those recipients of the Official Notice who were not referred for prosecution. Since ACCS' letters would likely lead an unsophisticated consumer to believe that failure to participate in the Bad Check Diversion Program would result in prosecution, and there is no evidence that the district attorney actually intended to prosecute each letter recipient, the Court finds that ACCS and those individuals who materially participated in its check collection operations violated the FDCPA.

### 4. Failure to Include FDCPA–Mandated Statements

▮ Plaintiffs contend that ACCS did not include any FDCPA-mandated statements in its letters to check writers. (Plaintiffs' Motion at 25–26.)

The FDCPA provides that it is a violation to "fail[ ] to disclose in the initial written communication with the consumer . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector." 15 U.S.C. § 1692e(11). The FDCPA further provides:

Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

49. (SAC, Exs. 1, 3, 4, 6, 7, 12; Defendants' Answer ¶¶ 30, 36, 39, 44, 60.)

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a): *see also Terran,* 109 F.3d at 1430.

▉ Here, it is undisputed that none of the letters that ACCS sent to check writers disclosed any of the required information outlined above.[50] Defendants contend that since the district attorney authorized ACCS to send notices inviting participation in a criminal bad check diversion program, they were under no obligation to include statements that apply only to civil debt collection. (Defendants' Opposition at 8.) The Court finds, however, that a district attorney's authorization does not by itself exempt a private company engaged in debt collection from the requirements of the FDCPA.

Since on their face, ACCS' written communications with check writers did not contain the statutorily-required disclosures, the Court finds that ACCS and those individuals who materially participated in its check collection operations violated the FDCPA.

Accordingly, the Court GRANTS Plaintiffs' Motion for Summary Judgment and DENIES Defendants' Motion for Summary Judgment as to Defendant Mealing's and Defendant Hasney's liability in relation to Plaintiffs' Fourth Claim for Relief for violation of the FDCPA.

### D. *Violation of Privacy Rights Under the California Constitution*

Plaintiffs contend that Defendants violated class members' privacy rights protected under the California Constitution by gaining unauthorized access to check writers' bank records. (Plaintiffs' Motion at 26–27.) Defendants respond that (1) ACCS was authorized to access bank records on behalf of the district attorney, and (2) neither Defendant Mealing nor Defendant Hasney ever accessed Plaintiffs' bank records and never instructed anyone else to. (Defendants' Opposition at 17.)

The California Constitution, article 1, section 1 provides: "All people are by nature free and independent and have inalienable rights. Among these are ... pursuing and obtaining ... privacy." The right of privacy under the California Constitution "extends to one's confidential financial affairs." *Valley Bank of Nevada v. Superior Court,* 15 Cal.3d 652, 656, 125 Cal.Rptr. 553, 542 P.2d 977 (Cal.1975): *see also Molski v. Franklin,* 222 F.R.D. 433, 438 (S.D.Cal.2004). "[T]here is a right to privacy in confidential customer information whatever form it takes, whether that form be tax returns, checks, statements, or other account information." *Fortunato v.*

---

**50.** (SAC, Exs. 1, 3, 4, 6, 7, 12, 14–19; Defendants' Answer ¶¶ 30, 36, 39, 44, 60.)

*Superior Court,* 114 Cal.App.4th 475, 481, 8 Cal.Rptr.3d 82 (Cal.Ct.App.2003).

Pursuant to Cal. Gov't Code § 7470(a), an agent of a state or local agency may, "in connection with a civil or criminal investigation of a customer, ... request or receive copies of, or the information contained in, the financial records of any customer from a financial institution" only in one of four specified circumstances: (1) the customer "has authorized disclosure," (2) the "financial records are disclosed in response to an administrative subpoena or summons," (3) the "financial records are disclosed in response to a search warrant," and (4) the "financial records are disclosed in response to a judicial subpoena or subpoena duces tecum."

Cal. Gov't Code § 7480(b) provides:

When any police or sheriff's department or district attorney in this state certifies to a bank, credit union, or savings association in writing that a crime report has been filed that involves the alleged fraudulent use of drafts, checks, access cards, or other orders drawn upon any bank, credit union, or savings association in this state, the police or sheriff's department or district attorney ... may request a bank, credit union, or savings association to furnish, and a bank, credit union, or savings association shall furnish, a statement setting forth [specified customer financial information].

Here, in support of its contention that ACCS violated check writers' privacy rights, Plaintiffs provide only one piece of evidence: an employee write-up of a sales call with the Los Angeles District Attorney dated June 6, 2003 stating that ACCS reviews 900 bank records per month but only refers 11 cases per month for prosecution. (Sales Call Summary, Plaintiffs' Motion, Ex. 29.)

The Court finds that Plaintiffs have provided no evidence that ACCS requested or reviewed Plaintiffs' bank statements. The sales call write-up only purports to describe ACCS' activities in Los Angeles County. Since ACCS' contracts are with local district attorneys, ACCS' operations in Los Angeles may differ substantially from those in other parts of the state. It is undisputed that all Plaintiffs reside either in San Mateo County, Santa Clara County, or Petaluma, California. (*See* SAC ¶¶ 28, 43, 49, 54, 63.) Thus, there is no evidence that ACCS' activities in Los Angeles would have any impact on Plaintiffs.

In the absence of any evidence that Plaintiffs suffered a constitutional deprivation, the Court DENIES Plaintiffs' Motion for Summary Judgment as to Plaintiffs' Third Claim for Relief for violation of the California Constitution.

### E. *California UCL*

■ Plaintiffs contend that they are entitled to restitution and injunctive relief for Defendants' alleged unlawful and unfair check collection practices pursuant to the California Unfair Competition Law ("UCL"). (Plaintiffs' Motion at 27–29.) Defendants respond that injunctive relief is not warranted because Defendants Mealing and Hasney sold ACCS in November 2004 and have not been involved in the company since. (Defendants' Opposition at 17.)

■ California's UCL statute prohibits unfair competition by means of unlawful, unfair or fraudulent business practices. *In re Pomona Valley Med. Group,* 476 F.3d 665, 674 (9th Cir.2007); Cal. Bus. & Prof.Code §§ 17200 *et seq.* "Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices that are unlawful, or unfair, or fraudulent." *AICCO, Inc. v. Ins. Co. of North Amer.,* 90 Cal.App.4th

579, 587, 109 Cal.Rptr.2d 359 (Cal.Ct.App. 2001). "When determining whether a practice is 'unlawful,' section 17200 'borrows' violations of other laws, and makes them independently actionable under the UCL. Virtually any law—federal, state or local—can serve as a predicate for a section 17200 claim." *Id.*

Here, the Court has found that Defendants Mealing and Hasney are liable for various FDCPA violations; this finding serves as predicate for violations of the UCL. Accordingly, the Court GRANTS Plaintiffs' Motion for Summary Judgment as to Plaintiffs' Fifth Claim for Relief for violation of Cal. Bus. & Prof.Code §§ 17200 *et seq.*

In light of Defendants' representation that Defendants Mealing and Hasney are no longer associated with ACCS and have no intention of reentering the check collection business, and the dearth of evidence to the contrary, the Court finds that injunctive relief is unnecessary at this time. *See Sun Microsystems v. Microsoft Corp.,* 188 F.3d 1115, 1123 (9th Cir.1999) ("Under California law, a plaintiff cannot receive an injunction for past conduct unless he shows that the conduct will probably recur.").

### F. *Damages*

Plaintiffs contend that they are entitled to actual damages under the FDCPA and restitution under the UCL. (Plaintiffs' Mo-

tion at 29–30.) Plaintiffs further contend that Plaintiffs del Campo, Medina, and Johnston are each entitled to the maximum statutory award permitted by the FDCPA. (*Id.*)

Plaintiffs present evidence that during the class period, ACCS collected a total of $47,497,386.50 in fees, including $25,763,793.44 in "program" or "class" fees.[51] The Court finds that the declaration of a single database analyst is insufficient to establish the appropriate measure of damages in this case. Accordingly, the Court reserves all remedial issues for trial.

### V. CONCLUSION

The Court GRANTS in part and DENIES in part the parties' Cross–Motions for Summary Judgment as follows:

(1) Plaintiffs' Motion for Summary Judgment as to Defendant Mealing's and Defendant Hasney's liability for FDCPA violations is GRANTED, Defendants' Motion is DENIED;

(2) The parties' Cross–Motions as to Defendant Inc.'s liability for FDCPA violations are DENIED;

(3) Plaintiffs' Motion for Summary Judgment as to Defendants' liability for violating Plaintiffs' privacy rights under the California Constitution is DENIED;[52]

---

**51.** (Declaration of Paul Winans in Support of Plaintiffs' Motion for Summary Judgment and Injunction Against Defendant Don Mealing, Lynn Hasney and Inc. Fundamentals, Docket Item No. 808.) Defendants object to several portions of the Declaration of Paul Winans on the ground, *inter alia,* that Plaintiffs have failed to establish Mr. Winans's qualifications as an expert with regard to the subject matter of this lawsuit. (Defendants' Objections ¶¶ 1–3.) Since the Court declines to address remedial issues at this time, the Court OVERRULES Defendants' Objections as premature,

without prejudice to challenging Mr. Winans's qualifications when remedial issues are addressed.

**52.** The Court notes that Defendants did not move for summary judgment as to Plaintiffs' constitutional right of privacy claim. (*See* Defendants' Motion.) Thus, the Court does not consider whether the lack of evidence that Defendants improperly requested or reviewed Plaintiffs' bank records warrants adjudication of Plaintiffs' constitutional claim in favor of Defendants.

(4) Plaintiffs' Motion for Summary Judgment as to Plaintiffs' UCL claim is GRANTED; and

(5) The parties' Cross–Motions as to all remedial issues are DENIED.

On **June 28, 2010 at 11 a.m.,** the parties shall appear for a Preliminary Pretrial Conference. On or before **June 18, 2010,** the parties shall file a Joint Preliminary Pretrial Conference Statement. The Statement shall include, among other things, the parties' readiness for trial on remaining issues, including damages, and an update on the parties settlement efforts.